## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| NATHAN S. BRYAN; PNEUMA NITRIC OXIDE, LLC; NITRIC OXIDE INNOVATIONS, LLC; and BRYAN NITRICEUTICALS, LLC,<br><br>　　　　　　　Plaintiffs,<br>　　　v.<br>HUMAN POWER OF N COMPANY; JOEL KOCHER; AND ANNMARIE KOCHER<br><br>　　　　　　　Defendants. | Civil Action No. 1:23–CV–01314<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Dr. Nathan S. Bryan ("Dr. Bryan"); Pneuma Nitric Oxide, LLC ("Pneuma Nitric Oxide"); Nitric Oxide Innovations, LLC ("NOi"); and Bryan Nitriceuticals, LLC ("Bryan Nitriceuticals") (collectively, "Plaintiffs") hereby file this Complaint against Defendants Human Power of N Company ("Human N"), Joel Kocher, and AnnMarie Kocher (collectively, "Defendants") and alleges as follows:

## NATURE OF ACTION

1.　　　This lawsuit presents another unfortunate and unfair—but all too familiar—instance of an accomplished scientist who wanted to use his knowledge and research to develop and provide products that benefit the masses, only to be taken advantage of and backstabbed by his conniving and egotistical business partners.

2.　　　Plaintiff Dr. Bryan is a leading scientist in molecular medicine and nitric oxide biochemistry who developed a system and technology for generating nitric oxide gas using natural products through almost 20 years of nitric oxide research.  Dr. Bryan was determined to

66372244                                                  1

bring this nitric oxide technology to market because the technology allows the creation of nitric oxide products that are beneficial to human health without the use of synthetic components. He presented to countless potential investors to obtain the necessary funding to accomplish his goal.

3.      Eventually, Dr. Bryan met Defendants Joel and AnnMarie Kocher who initially seemed similarly invested and interested in the nitric oxide technology that Dr. Bryan and understood the technology's potential. Dr. Bryan and Joel and AnnMarie Kocher became business partners and co-founded Defendant Human N to develop, market, and sell dietary supplements products that enhance nitric oxide production in the human body using the nitric oxide technology that Dr. Bryan developed.

4.      Dr. Bryan, using his knowledge and experience in nitric oxide from his years of research, spent countless hours developing and testing Human N original (and now best known) products, promoting Human N's original products, and educating others about the science behind Human N's original products and the benefits of nitric oxide and Human N's original products. But, after Dr. Bryan grew Human N's business and science reputation and helped Human N become a thriving and successful company, the Kochers pushed Dr. Bryan out of the company and excluded him from Human N's business and operations. What is more, the Kochers and HumanN started unfairly competing against Dr. Bryan in his other business endeavors, including Plaintiffs Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals.

5.      Plaintiffs are forced to bring this action against Defendants to address their improper conduct against Dr. Bryan and the substantial damages Plaintiffs have suffered because of Defendant's wrongful actions.

## PARTIES

6.      Plaintiff Dr. Bryan is an individual residing in Rockdale, Texas.

7.     Plaintiff Pneuma Nitric Oxide is a Texas limited liability corporation with its principal place of business in Rockdale, Texas.

8.     Plaintiff NOi is a Texas limited liability corporation with its principal place of business in Rockdale, Texas.

9.     Plaintiff Bryan Nitriceuticals is a Texas limited liability corporation with its principal place of business in Rockdale, Texas.

10.     Defendant Human N, formerly known as Neogenis Labs, is a Texas for-profit corporation that states a principal place of business at 1250 S. Capital of Teas Highway 1, West Lake Hills, Texas 78746 in its filing with the Texas Secretary of State.  Human N may be served with process by serving its registered agent for service Robert L. Rouder at 1410 Waldorf Avenue, Austin, Texas 78721.

11.     Defendant Joel Kocher is an individual residing in Austin, Texas.  Defendant Joel Kocher may be served with process at 26810 Founders Place, Spicewood, Texas 78669 or wherever he may be located.

12.     Defendant AnnMarie Kocher is an individual residing in Austin, Texas. Defendant AnnMarie Kocher may be served with process at 26810 Founders Place, Spicewood, Texas 78669 or wherever he may be located.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of Plaintiffs' federal claims for false advertising and unfair competition under the Lanham Act pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331. The Court has subject matter jurisdiction of the related Texas state law claims pursuant to 28 U.S.C. §§ 1331 and 1367.

14.     The court has personal jurisdiction over Human N as it is a Texas for-profit corporation with its principal place of business in West Lake Hills, Travis County, Texas.

15.     The court has personal jurisdiction over Joel Kocher and AnnMarie Kocher because each individual is a resident of Austin, Travis County, Texas.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because substantial part of the events and omissions giving rise to the claim occurred in this district.

## FACTS

I.     **Dr. Bryan is a Pioneer and Leading Researcher in Molecular Medicine and Nitric Oxide Biochemistry**

17.     Dr. Bryan, a Biochemist and Doctor of Molecular and Cellular Physiology, is an international leader in molecular medicine and nitric oxide biochemistry and has been involved in nitric oxide research for the past 20 years.  Dr. Bryan's discoveries and findings from his nitric oxide-related research have transformed the development of safe and effective functional bioactive natural products in the treatment and prevention of human disease and have the potential to provide the basis for new preventive or therapeutic treatments.

18.     Dr. Bryan received his Bachelor of Science degree in Biochemistry from the University of Texas at Austin and his doctoral degree from Louisiana State University School of Medicine in Shreveport.  After completing a two-year post-doctoral fellowship as the Kirschstein Fellow at Boston University School of Medicine in the Whitaker Cardiovascular Institute, Dr. Bryan was recruited to join the faculty of the University of Texas Health Science Center at Houston ("UTHealth Houston") by Dr. Ferid Murad in 2006.  Dr. Bryan's research focused on drug discovery by screening natural product libraries for active compounds during his tenure as faculty and independent investigator at UTHealth Houston's Institute of Molecular Medicine.

19.    Dr. Bryan's nitric oxide research has led to numerous seminal discoveries in the field.  For example, Dr. Bryan was the first to describe nitrite and nitrate as indispensable nutrients for optimal cardiovascular health and to discover and demonstrate an endocrine function of nitric oxide through the formation of S-nitrosoglutathione and inorganic nitrite. Dr. Bryan also discovered through his research unique compositions of matter than can be used to safely and effectively generate and restore nitric oxide in humans – a technology that has been validated in at least six published clinical trials.

20.    Dr. Bryan's research discoveries during his nine years at UTHealth Houston has resulted in over a dozen issued patents for product formulations (which are owned by the University of Texas).  One such patent is a nitric oxide formulation that generates nitric oxide reactions in the human body that are beneficial to human health, especially cardiovascular health, using natural products found in nature (the "UT-Patented Nitric Oxide Technology").

## II.    Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals Research, Develop, Market, Advertise, and/or Sell Nitric Oxide Products Based on Dr. Bryan's Research

21.    Dr. Bryan has applied the many discoveries and developments from his nitric oxide research to various entrepreneurial and commercial pursuits, including founding and leading companies that produce, research, and provide nitric oxide-based products such as Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals.

22.    Pneuma Nitric Oxide is a supplier of innovative nitric oxide products Dr. Bryan independently developed, based on his years of experience, knowledge and training in researching nitric oxide, with a focus on skincare, beauty, and/or cosmetic products that counter age-related nitric oxide loss to combat aging skin.  Pneuma Nitric Oxide markets, advertises, and sells products – such as the N1O1 Nitric Oxide Activating Serum, Pneuma face wash, N1O1 Nitric Oxide Boosting Age-Defiance Face Cream, N1O1 Nitric Oxide Boosting Age-Defiance

Eye Cream, and N1O1 Nitric Oxide Releasing Lozenges – that have been shown to activate and enhance nitric oxide production in the skin and within the body in laboratory tests.

23.     NOi is a privately held biotechnology company involved in the development of nitric oxide based drugs and therapies.  NOi researches new and innovative products, again utilizing Dr. Bryan's years of experience, knowledge and training in researching nitric oxide, with a focus on developing novel and innovative nitric-oxide based therapies for human disease. NOi researched and developed the NOviricid, which is the first oral systemic nitric oxide-based COVID-19 drug that has demonstrated safety in high risk COVID patients.  NOi has a license to Dr. Bryan's patents from UTHealth to develop drugs through the FDA.

24.     Bryan Nitriceuticals is a supplier of innovative nitric oxide nutraceuticals.  Bryan Nitrceuticals markets, advertises, and sells dietary supplement products that promote nitric oxide production in the human body, such as the No2u Lozenges and N.O.Beetz.

III.    **Before His Current Endeavors, Dr. Bryan Co-Founded Human N and Helped Human N Develop Products Based On His Expertise in Nitric Oxide, Only for Human N (Through the Kochers) to Later Wrongly Exclude and Ostracize Dr. Bryan and Then Unfairly Compete Against Him**

   A.    **Dr. Bryan Founded Human N With the Kochers to Commercialize the Nitric Oxide Technology Discovered and Developed by Dr. Bryan**

25.     After discovering a system and technology for generating nitric oxide gas using natural products, Dr. Bryan began looking for opportunities to commercialize the UT-Patented Nitric Oxide Technology that he discovered and developed.  Dr. Bryan strived to bring this nitric oxide technology to market because of the technology's capability to develop nitric oxide products that benefit human health or prevent human diseases without using synthetic properties. Dr. Bryan founded and formed NitroSolvex in an effort bring the nitric oxide technology he developed to market.

26.     Dr. Bryan met and spoke with numerous of potential investors, private equity groups, and asset and wealth management firms to raise funds for NitroSolvex and was ultimately connected with Mark Reinking ("Reinking").  Reinking was interested in NitroSolvex's potential, and he founded and formed another company named NitroRam to secure the necessary patents and rights from the University of Texas to allow for the commercialization of UT-Patented Nitric Oxide Technology.  NitroRam attained the technology rights for Dr. Bryan's intellectual property in February 2009.

27.     After NitroRam obtained the technology rights from UTHealth, Dr. Bryan continued to seek additional investment to finance and achieve his goal of commercializing the nitric oxide technology.  For six months, Dr. Bryan regularly drove between Houston (where he lived) and Austin (where NitroRam is based) to meet and speak with potential investors to present and pitch the technology.  Following one such presentation, Dr. Bryan received a call from Reinking stating that a former Dell employee was interested in investing and in bringing in a team to run the company, and this potential investor asked Dr. Bryan to spend the weekend with him and his wife to get to know Dr. Bryan personally.  Dr. Bryan later learned that these potential investors are Joel ("Joel") and AnnMarie ("AnnMarie") Kocher (collectively, "the Kochers").

28.     Dr. Bryan met the Kochers and spent a weekend with them at their home in West Lake Hills (commonly referred to as Westlake) in Austin, Texas.  While at the Kochers' home, Dr. Bryan also met Janet Zand ("Zand"), an acupuncturist who had developed dietary supplemental products and a friend of the Kochers.  Dr. Bryan spent the weekend teaching Joel, AnnMarie, and Zand about nitric oxide and explaining his discoveries and potential for the product technology based on the UTHealth intellectual property he developed.  Dr. Bryan, Joel,

66372244                                    7

AnnMarie, and Zand also discussed product concepts and ideas.  The week following Dr.

Bryan's weekend with the Kochers, Joel organized a meeting in Austin, Texas, with marketing

professionals to develop a "go to market strategy" for the nitric oxide technology that Dr. Bryan

developed at that time.

29.     Around the same time, Dr. Bryan learned that the Kochers did not like

NitroRam's equity structure.  The Kochers wanted and encouraged Dr. Bryan to convince

Reinking to relinquish the licenses from University of Texas so that a new company – formed

with a better equity structure for the Kochers – can secure the licenses needed for development

and commercialization.  Dr. Bryan reasonably believed from his conversations and interactions

with the Kochers that the Kochers would be able to successfully commercialize the UT-Patented

Nitric Oxide Technology that Dr. Bryan discovered and developed.  Dr. Bryan also understood

that the Kochers would not agree to be Dr. Bryan's business partner under the existing

agreement.  Dr. Bryan spoke with Reinking who eventually agreed to give up the licenses from

University of Texas and relinquishing $750,000 in milestone payments that NitroRam owed to

UTHealth.

30.     Soon after Reinking gave up the licenses, Dr. Bryan, the Kochers, and Zand

founded what is now Human N (the company was initially named Neogenis Labs), of which Dr.

Bryan, the Kochers, and Zand were equal partners, and secured the necessary licenses for the

nitric oxide technology from the University of Texas on March 25, 2010.  Despite the equal

partnership, Joel was not involved with Human N's business in the company's early years (and

was not involved at all for the first year as he was preoccupied with his other businesses selling

video games and floor mats).  Instead, most of the work was done by AnnMarie and Dr. Bryan.

31.     Upon execution of the license agreement with the University of Texas, Human N also entered into a sponsored research agreement with the University of Texas Health Sciences Center.  The sponsored research agreement allowed Dr. Bryan to use part of his time as a full-time Assistant Professor at the university to work on company-related projects.  Under this agreement, any inventions or discoveries made by Dr. Bryan at his University of Texas lab belonged to the University of Texas.  Neogenis Labs (HumanN) does not nor has ever had any research lab or conducting any research or investigations within the company.  All research and product development was conducted by Dr. Bryan at his lab at the Institute of Molecular Medicine under the executed Sponsored Research Agreement that clearly place ownership of any trade secret or intellectual property to the University.

32.     Dr. Bryan is a 16% shareholder of Human N in addition to being one of Human N's founders.  Dr. Bryan held shares in Human N under the "NeoGenis Laboratories, Inc. 2013 Non-Qualified Stock Option Plan"[1] that was approved by Human N's shareholders in February 2023 and that remains in effect today.  Under the Plan, Dr. Bryan was granted 47,500 options on July 1, 2013.

**B.     Dr. Bryan Uses His Know-How in Nitric Oxide to Develop Human N's Best-Selling and Scientifically-Backed Nitric Oxide Products**

33.     Dr. Bryan was initially excited by the co-founding of Human N and his business partnership with the Kochers.  Dr. Bryan had been working for years to bring the UT-Patented Nitric Oxide Technology that he discovered and developed to market in order to develop products that help and benefit human health.  Dr. Bryan believed the co-founding of Human N and his business partnership with the Kochers was an important step in reaching his goal to commercialize the UT-Patented Nitric Oxide Technology.  Dr. Bryan thus dedicated time,

---

[1] Human N was previously named NeoGenis Laboratories, Inc.

energy, and resources to building Human N's business on top of his responsibilities as a full-time faculty at UTHealth Houston's Institute of Molecular Medicine. Dr. Bryan considered Human N was his business and company, and he was invested in making Human N succeed.

34.     After co-founding Human N, Dr. Bryan then began searching for manufacturers to bring his nitric oxide product concepts to reality. Dr. Bryan worked with a manufacturer who had developed an easy-melt technology for dietary supplements to create prototypes of a solid-dose form of nitric oxide gas. Dr. Bryan tested the prototypes at his University of Texas lab under the sponsored research agreement and found that the prototypes worked: Dr. Bryan succeeded in making the first solid dose form of bioactive nitric oxide gas form using the UT-Patented Nitric Oxide Technology. Dr. Bryan's discovery and achievement resulted in Human N's first product, Neo40 – a quick dissolve tablet, which was launched in August 2010.

35.     Dr. Bryan continued to test different prototypes of Human N's nitric oxide products at his University of Texas lab for the remainder of his tenure at the University of Texas' Institute of Molecular Medicine using the UT-Patented Nitric Oxide Technology. As a result of Dr. Bryan's efforts, knowledge and skill, Human N was able to develop, market, and sell nitric oxide products that were scientifically tested and supported. Dr. Bryan spent countless hours in his lab at the University of Texas analyzing certain ingredients or a final product to determine, for example, nitrate and nitrate amounts and the ingredient's or final product's ability to generate nitric oxide gas when dissolved in water. Through the tests he conducted in his lab, Dr. Bryan provided Human N information that was crucial to product development—including the amount of nitrite and nitrate appropriate for a specific dietary supplement product and necessary for a product to effectively, but safely, generate nitric oxide gas while abiding by the guidelines required for a dietary supplement. Information the Kocher's had no experience or knowledge.

Dr. Bryan also provided information relating to the composition of products, such as the specific amount of Vitamin C required to prevent nitrosative stress and unwanted chemical reactions. Moreover, Dr. Bryan tested products after flavors were added to ensure the flavor ingredients did not interfere with a product's nitric oxide activity.

36.     In 2012, Dr. Bryan started testing beet powders in his University of Texas lab given a market demand for products containing beets because of beets' ability to increase nitric oxide levels in the human body.  Dr. Bryan found a beet supplier in Florida, visited the supplier's facility, and worked with the supplier to develop a particular fermented beet powder that could offer a source of nitric oxide using the UT-Patented Nitric Oxide Technology (the "Patented Fermented Beet Powder").  Dr. Bryan created batches of the potential product containing the Patented Fermented Beet Powder and tested the batches to verify the nitric oxide activity before making the final product.  Dr. Bryan's work resulted in Human N's original line of beet-based products: BeetElite, SuperBeets Original Apple, and SuperBeets Black Cherry (collectively, the "Human N Original Beet Products").  The Human N Original Beet Products would become Human N's top-selling and flagship products, generating hundreds of millions in revenue for Human N.

37.     In addition to contributing to Human N with his expertise in nitric oxide—and access to a University of Texas laboratory for product testing and development—Dr. Bryan promoted Human N's products at various conferences, trade shows, lectures, webinars, trainings, and other speaking engagements and events to educate potential customers about the benefits of nitric oxide to human health and to market Human N's products.  Dr. Bryan attended these events to speak about Human N's products on top his responsibilities as a full-time faculty member of UTHealth Houston's Institute of Molecular Medicine.  Dr. Bryan also conducted

several infomercials and TV ads for HumanN and became the face and science behind HumanN

nitric oxide products.  It was Dr. Bryan's science, reputation and credibility that catapulted

HumanN as the leader in nitric oxide product technology.

38.     While Dr. Bryan entered into a consulting agreement with Human N, which was

in effect from 2010 to 2013 (the "2010 Consulting Agreement"), Dr. Bryan received a modest

consultant fee ($2,500-$5,000 per month) from Human N until royalties from UTHealth

exceeded $5,000 per month.  At that time, HumanN no longer compensated Dr. Bryan for his

contributions to the company through at least 2019 other than minimal amounts that fall far short

of fairly and appropriately compensating Dr. Bryan for his work and efforts.

C.      **Dr. Bryan Becomes More Involved in Human N's Business Which Leads Disagreements Between the Kochers and Dr. Bryan**

39.     In 2015, Dr. Bryan resigned from his faculty position at UTHealth Houston's

Institute of Molecular Medicine, which allowed Dr. Bryan to devote more time on Human N-

related projects and on helping the company grow.  As he spent more time working on

Human N, Dr. Bryan became the face of the company and was featured on nationwide radio and

television infomercials and advertisements as the inventor of the technology on which Human N

was founded and from which the Human N Original Beet Products were developed.  Human N

flourished and sales of the Human N Original Beet Products (which contain the Patented

Fermented Beet Powder and thus relied on the UT-Patented Nitric Oxide Technology) increased.

40.     Joel quickly took issue with the success and growing recognition Dr. Bryan was

receiving for his work with Human N.  The Kocher's communicated to HumanN employees to

minimize Dr. Bryan's media exposure and to minimize his growing popularity.  Although Joel

had been absent from Human N's affairs and development, Joel wanted to be the face of the

company when it was beginning to be a flourishing enterprise.  Joel wanted to receive credit for

making Human N a successful company, despite not having contributed to the company early on.

41.     As Dr. Bryan became more involved in Human N's business, he gained greater

insight into the company's financial problems as well.  Human N frequently encountered

accounting issues – including, on information and belief, repeated instances of missing corporate

funds – and constantly risked running out of funds and/or failing to meet its financial obligations

despite the company's increasing sales and revenues.  Dr. Bryan was forced to sign a promissory

note on behalf of HumanN for a personal loan the Kocher's made to the company.  The Kochers

often requested that Janet Zand and Dr. Bryan help personally pay for legal bills for the company

resulting from a lawsuit from a John Thompson.

42.     Human N also relied on tactics and strategies to cut costs that were, at best,

questionable.  For example, the Kochers tried to reduce costs by improperly refusing to pay

royalties owed to the University of Texas from sales of the Human N Original Beet Products.

The Kochers' decision violated Human N's agreement with the University of Texas relating to

the use of the UT-Patented Nitric Oxide Technology because the Human N Original Beet

Products were created using this technology.  Indeed, the packaging of Human N Original Beet

Products identified the patents associated with the UT-Patented Nitric Oxide Technology.  After

Dr. Bryan persuaded the Kochers to take the correct action, the Kochers agreed to pay back the

royalties owed to the University of Texas (which amounted to hundreds of thousands of dollars)

and cure the Human N's breach and default of the licensing agreement.

43.     Even though the Kochers' refusal to pay royalties to the University of Texas was

wrong and exposed the company to risk and liability, Joel saw Dr. Bryan as a traitor for stopping

Human N's breach of the licensing agreement and causing Human N to have to pay millions

more to the University of Texas for ongoing royalties on the patented beet products (despite these payments being contractually required). Joel began attempting to turn the Human N's directors, shareholders, officers, and employees against Dr. Bryan. The Kocher's conspired to create products under the Superbeet brand, that was built on Dr. Bryan's and UTHealth's science, that did not practice the patents so the company would not have to pay a royalty to UTHealth and thus to Dr. Bryan. The Kochers also excluded Dr. Bryan from company meetings and product development meetings. By 2017, Human N, through the Kochers' doing, no longer participated or supported the medical trade shows in which Dr. Bryan was speaking to promote Human N and the Human N Original Beet Products.

**D.      Human N and the Kochers Try to Control Dr. Bryan Through a Disguised Non-Compete Agreement and Through Improper Threats**

44.      In early 2017, AnnMarie told Dr. Bryan that a private equity group was interested in investing in Human N but conditioned the investment on Dr. Bryan's signing a consulting agreement with Human N with a non-compete clause. Dr. Bryan refused to sign such a consulting agreement. AnnMarie then told Dr. Bryan that the private equity group was willing to buy up to 15% of shares held by Human N's founders, which includes Dr. Bryan, and provide all the capital Human N was seeking to fund the company's growth. AnnMarie further told Dr. Bryan that if he did not agree to sign the consulting agreement, Dr. Bryan would be harming all shareholders of Human N by preventing their ability to take some money off the table and by hindering the company's growth by causing Human N to lose an investor. Dr. Bryan ultimately signed the consulting agreement (the "2017 Consulting Agreement") under the impression that doing so would benefit all shareholders of the company and would again be involved in the company as a consultant. In actuality, however, the 2017 Consulting Agreement was a fraudulent attempt to handcuff Dr. Bryan and the beginning of the Kocher's plan to wrongly cut

off Dr. Bryan's access to Human N.  The Kochers had no interest or intent in receiving any consultation from Dr. Bryan.  Indeed, the Kochers did not involve Dr. Bryan in further Human N business or new product development from that time forward nor engage his advice or consultation at any time during the 2017 agreement.

45.     By January 2019, it became clear that the Kochers were trying to push Dr. Bryan out of the company he helped found and grow and retain the patents Dr. Bryan pioneered for themselves.  In January 2019, Dr. Bryan participated in discussions and negotiations with Human N to amend the 2017 Consulting Agreement.  During these discussion and negotiations, Human N threatened to reveal information relating to Dr. Bryan, and thereby wreck his reputation, destroy his credibility and ruin his personal life and professional endeavors, should Dr. Bryan not cooperate with Human N and the company's requests.  Human N disclosed that it had hired private investigators to follow Dr. Bryan for several months and gathered and obtained personal information relating to Dr. Bryan.  These threats caused Dr. Bryan to feel compelled to agree to the terms of the amendment of the 2017 Consulting Agreement as drafted and proposed by Human N (the "2019 Amendment") that would specifically allow the development of topical nitric oxide product technology for skin care and beauty.

IV.     **Human N Falsely Claims That All of Their Products are Backed by Dr. Bryan's Nitric Oxide Research and Findings, Which Harms Pneuma Nitric Oxide, NOi, and Bryan Nitriceutals**

46.     In 2017, Human N began developing new products to expand their product offerings without the benefit of Dr. Bryan's knowledge, skill, or opinion.  In fact, HumanN deliberately developed products that Dr. Bryan demonstrated that did not and could not provide any nitric oxide activity based on his own testing and research.  Human N's new products did not use the Patented Fermented Beet Powder that Dr. Bryan had developed with the UT-Patented Nitric Oxide Technology, allowing Human N to skirt royalty fees under the licensing agreement

with the University of Texas.  But without the Patented Fermented Beet Powder, Human N's

new products did not create or generate nitric oxide unlike the Human N Original Beet Products.

Nevertheless, Human N's new products are branded and categorized as "Superbeets" products –

just like the Human N Original Beet Products—suggesting the new products contain the same

Patented Fermented Beet Powder and similarly created and generated nitric oxide.

47.      But the inclusion of "Superbeets" in the names of Human N's new products is

inappropriate considering that none of Human N's new products contained the Patented

Fermented Beet Powder nor do they practice the patents.  Further, while the Human N Original

Beet Products were scientifically tested by Dr. Bryan and confirmed to produce nitric oxide,

Human N's new products' claims of increasing nitric oxide production were not backed by any

scientific tests.

48.      Dr. Bryan raised the issues with Human N's new products with the Kochers and

Human N's other executives, officers, directors, and/or shareholders as a shareholder of

Human N.  Yet Dr. Bryan's concerns and objections were not only ignored but also used by the

Kochers as fuel to further alienate Dr. Bryan from the company and to portray him has someone

who is against the Human N's interest and sabotaging the company's growth.

49.      Human N falsely claims that ___**all**___ of its products are substantiated by certain

scientific formulations and research (some of which were developed and conducted by Dr.

Bryan) and supported by purported client results.  But these statements are false and misleading

because Human N's products – other than the Human N Original Beets Products and Neo40 –

are made with new formulations that do not contain the Patented Fermented Beet Powder and are

not supported by any independent and/or additional research or studies.  For example:

a.      Human N claims that its SuperBeets Capsules result from "[o]ver 12 years of research and development" in connection with growing "premium beet crops that are standardized and independently validated for their concentrated, naturally occurring dietary nitrate content" which is untrue, false, and misleading because the SuperBeets Capsules do not contain UT-Patented Fermented Beet Powder.  Furthermore, capsules do not provide enough volume to deliver enough beet powder to provide any real nitric oxide effect.



b.      Human N suggests its original product BeetElite is simply renamed as SuperBeets Sport even though SuperBeets Sport contains different ingredients from BeetElite and does not include the same scientific formulation in BeetElite, nor does it list the same patents as BeetElite.

Human N claims that "BeetElite is now SuperBeets Sport" and that "SuperBeets Sport is the same trusted formula as BeetElite, but with an added hydration benefit" – which is false because SuperBeets Sport does not contain the UT-Patented Fermented Beet Powder and thus has a materially different formula than BeetElite.

Is SuperBeets® Sport the same as BeetElite®?

BeetElite® is now SuperBeets® Sport, but even better than before. SuperBeets® Sport is the same trusted formula as BeetElite®, but with an added hydration benefit from organic coconut water powder that promotes hydration & electrolyte replenishment. It is also now NSF Certified for sport.

Human N's claims for SuperBeets Sport are also exactly the same as those asserted for BeetElite – such as the number of teams and championship results and purported clinical study showing 18% increase in stamina – which cannot be true because the same tests were not conducted for SuperBeets Sport.  It is a different product.



c.     Human N also states that SuperBeets Sport is "[c]linically shown to increase endurance and stamina up to 18%." But this is a false and misleading statement because no clinical tests were conducted for SuperBeets Sport and no clinical studies show SuperBeets Sport produces the claimed results.



50.    Human N's false claims about its products other than the Human N Original Beets Products harm the reputation and/or sales of Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals and compromise the scientific credibility and reputation of Dr Bryan since the original products were based on his science. Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals each research,

sell, market, advertise, and/or otherwise supply to consumers nitric oxide products that are based on Dr. Bryan's research, findings, and technologies.  Human N's false claims that all of its product rely on and use the same research, findings, and technologies injures the reputation and/or sales of Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals.

51.     Human N intentionally makes false claims about the scientific support and formulation of its new products to capture as many of the consumers in the nitric oxide products space.  Human N misrepresents the scientific validity and make-up of their new products to create an unfair advantage in its competition against other companies supplying nitric oxide products like Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals.

## COUNT I

**False Advertising and Unfair Competition Under the Lanham Act (15 U.S.C. § 1125(a))**
**(Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals against Human N)**

52.     Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals repeat and incorporate by reference the allegations of paragraph 1 through 51 as if fully set forth herein.

53.     Human N has advertised, marketed, distributed, and sold competing nitric oxide products in Texas and in the same channels of interstate commerce as Pneuma Nitric Oxide and Bryan Nitriceuticals. NOi continues to develop nitric oxide drugs based on Dr. Bryan and UTHealth technology rights.

54.     Human N has knowingly made false and/or misleading statements of fact regarding the nature, characteristics, or quality of its products that are not the Human N Original Beets Products.  Human N had made these false and/or misleading representations on its website and in materials provided by Human N to customers or potential customers.  Human N's false and/or misleading statements include, but are not limited to:

a.      Claims that its SuperBeets Capsules result from "[o]ver 12 years of research and development" in connection with growing "premium beet crops that are standardized and independently validated for their concentrated, naturally occurring dietary nitrate content;"

b.      Claims that SuperBeets Sport "SuperBeets Sport is the same trusted formula as BeetElite;" and

c.      Claims that SuperBeets Sport is "[c]linically shown to increase endurance and stamina up to 18%."

55.     On information and belief, Human N's advertising has actually deceived and has the tendency to deceive a substantial segment of customers and potential customers of Pneuma Nitric Oxide's and/or Bryan Nitriceuticals' competing products.  This deception is material in that it is likely to influence the purchasing decisions of customers of Pneuma Nitric Oxide and/or Bryan Nitriceuticals.  The information also damages the reputation of NOi and Dr. Bryan personally since consumers associate Dr. Bryan and his science with HumanN and its nitric oxide products.

For example, customers of SuperBeets Capsules purchase the product for its purported scientific formula, scientific backing, and/or scientific results.





Similarly, customers of SuperBeets Sports purchase or use the product for its purported

scientific formula, scientific backing and/or scientific results.





56.    Human N's false advertising constitutes a violation of the federal Lanham Act, 15 U.S.C. § 1125(a).

57.    Human N has caused, and will continue to cause, damage and irreparable harm to Pneuma Nitric Oxide, NOi, and/or Bryan Nitriceuticals for which there is no adequate remedy at law.  Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are each entitled to an injunction under 15 U.S.C. § 1116 restraining Human N, its agents, employees, representatives and all persons acting in concert with it from engaging in further acts of false advertising, and ordering removal of Human N's false advertisements.

58.     Pursuant to 15 U.S.C. § 1117, Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are each entitled to recover from Human N the damages sustained by Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals, respectively, as a result of Human N's acts in violation of the Lanham Act 15 U.S.C. § 1125.  Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are each, at the time of this Complaint's filing, unable to ascertain the full extent of the monetary damages it has suffered by reason of Human N's actions.  HumanN has generated hundreds of millions of dollars in revenue over the past decade from the sale of its products.

59.     Pursuant to 15 U.S.C. § 1117, Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are each is further entitled to recover from Human N the gains, profits and advantages that it has obtained as a result of its acts.  Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are each, at the time of this Complaint's filing, unable to ascertain the full amount of the gains, profits and advantages Human N has obtained by reason of its acts.

60.     Pursuant to 15 U.S.C. § 1117, Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are each further entitled to recover the costs of this action.  Moreover, Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals are informed and believe, and on that basis allege, that Human N's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals to recover additional treble damages and reasonable attorneys' fees.  Their actions have also damaged the reputation and credibility of Dr. Bryan personally by falsely advertising its products that do not provide nitric oxide benefit.

## COUNT II

**Breach of Fiduciary Duties – Shareholders' Rights**
**(Dr. Bryan Against Human N's Directors, Officers, and/or Shareholders)**

61.     Dr. Bryan repeats and incorporate by reference the allegations of paragraph 1 through 60 as if fully set forth herein.

62.     Human N and its Directors, Officers, and/or Shareholders violated Texas Business Organizations Code Section 21.218 by refusing to allow Dr. Bryan examine and copy, at a reasonable time, the corporation's books, records of account, minutes, and share transfer records related to Dr. Bryan's stated purpose.  Dr. Bryan was a shareholder of Human N for at least 6 months immediately preceding his demand for inspection and/or a shareholder of at least 5 percent of all of Human N's outstanding shares when he made his demand for inspection.

63.     Pursuant to Texas Business Organizations Code Section 21.222, Dr. Bryan is entitled to any cost or expenses, including attorney's fees, incurred in enforcing his shareholder rights under Texas Business Organizations Code Section 21.218 in addition to any other damages or remedy afford to Dr. Bryan by law.

64.     Human N and its Directors, Officers, and/or Shareholders also violated Texas Business Organizations Code Section 21.354 by refusing Dr. Bryan's request to inspect the shareholder voting list during regular business hours.

65.     Dr. Bryan is informed and believes that Human N and/or the Kochers have misappropriated and/or squandered corporate funds that would otherwise be available to the Shareholders and reserves the right to amend this cause of action pending discovery and the receipt of company documentation.

66.     Human N and its Directors, Officers, and/or Shareholders further violated Dr. Bryan's shareholder rights by refusing to have distributions declared and paid.

## COUNT III

**Breach of Fiduciary Duty**
**(Dr. Bryan Against Joel Kocher and AnnMarie Kocher)**

67.     Dr. Bryan repeats and incorporate by reference the allegations of paragraph 1 through 66 as if fully set forth herein.

68.     Joel Kocher and AnnMarie Kocher owed a fiduciary duty to Dr. Bryan as business partners and co-founders of Human N.  Joel Kocher and AnnMarie Kocher breached their fiduciary duties to Dr. Bryan by casting him out of Human N's business and operations even though Dr. Bryan was a partner and co-founder of the company who made significant contributions to the company's success.  For example, Dr. Bryan developed Human N's first product (Neo40) and flagship products (the Human N Original Beets Products), tested and analyzed ingredients or final products to ensure their ability to generate nitric oxide, and promoted Human N's products at various speaking engagements and events by educating potential customers of the benefits and qualities of Human N's nitric oxide products.  Dr. Bryan helped Human N build its client base and boost its revenues through effective, scientifically-backed products and educational marketing by applying his experience, knowledge and training in nitric oxide—which Dr. Bryan gained through almost two decades of research and studies and without the Kochers' assistance or involvement.  Even so, the Kochers pushed Dr. Bryan out of the company he helped found and grow after Human N benefited from Dr. Bryan's expertise, time, and efforts by excluding and then competed against him.  The Kocher's intentionally and deliberately developed products they knew would not produce nitric oxide to avoid paying a royalty to UTHealth and further damage Dr. Bryan personally.

69.     Joel Kocher and AnnMarie Kocher also owed a fiduciary duty to Dr. Bryan pursuant a contract including, but not limited to, the 2010 Consulting Agreement and 2017

Consulting Agreement.  Joel Kocher and AnnMarie Kocher violated this duty by violating the terms of the agreement and actively impeding and preventing Dr. Bryan's ability to enjoy the benefits of the bargain.

70.     Dr. Bryan was damaged as a result of Joel Kocher and AnnMarie Kocher's breach of fiduciary duty.  Dr. Bryan, at the time of this Complaint's filing, unable to ascertain the full extent of the monetary damages it has suffered as result of Joel Kocher's and AnnMarie's breach.  Dr. Bryan seeks disgorgement, fee forfeiture, and the imposition of a constructive trust as a result of Joel Kocher's and AnnMarie's breach. Dr. Bryan asserts the discovery rule in response to the assertion of any statute of limitations defense.

## COUNT IV

### Claim for An Accounting
### (By Dr. Bryan Against Human N's Directors, Officers, and/or Shareholders)

71.     Dr. Bryan repeats and incorporate by reference the allegations of paragraph 1 through 70 as if fully set forth herein.

72.     Dr. Bryan is a shareholder of Human N and, on information and belief, has been damaged by Human N's misuse and/or misappropriation of corporate funds.  The amount due to Dr. Bryan is unknown and cannot be ascertained without an accounting because the necessary information to determine that amount is within the exclusive knowledge of Human N.

73.     Dr. Bryan seeks an Order demanding an accounting and demands that Human N provide a record of all company transactions, earnings, revenues, profits, and/or income from the founding of Human N to the present day.

## COUNT V

### Civil Conspiracy
### (Dr. Bryan Against Joel Kocher and AnnMarie Kocher)

74.     Dr. Bryan repeats and incorporate by reference the allegations of paragraph 1

through 73 as if fully set forth herein.

75.     Joel Kocher and AnnMarie Kocher had knowledge of, agreed to, and intended to

drive Dr. Bryan out of Human N, destroy his credibility and reputation, prevent him from

earning a living through their false advertising of Human N's products that are not the Human N

Original Beets Productions, and severely and wrongfully limit his ability use the nitric oxide

technology derived from Dr. Bryan's years of research for other commercial purposes.

76.     Either Joel Kocher and AnnMarie Kocher, or both, performed some act or acts to

further the conspiracy, including by misrepresenting reasons for entering into the 2017

Consulting Agreement and the effect Dr. Bryan's refusal to agree to the 2017 Consulting

Agreement and by threatening Dr. Bryan into agreeing to the 2019 Amendment through the use

of private investigators and deliberate attempts to minimize royalty payments to UTHealth.

77.     Joel Kocher and AnnMarie Kocher were aware of the harm likely to result from

such wrongful actions from the inception of their agreement to prevent Dr. Bryan from

exercising his rights as shareholder of Human N and receiving the benefit of his bargain from the

2010 and 2017 Consulting Agreements.

## COUNT VI

### Declaratory Relief
### (Dr. Bryan Against Human N)

78.     Dr. Bryan repeats and incorporate by reference the allegations of paragraph 1

through 77 as if fully set forth herein.

79.     Dr. Bryan is entitled to declaratory judgment against Human N that the 2017 Consulting Agreement, as amended by the 2019 Amendment, is invalid, void, and ineffective under the Texas Business and Commerce Code because the 2017 Consulting Agreement is effectively a standalone non-compete agreement that contains unreasonable and improper restrictions and because Dr. Bryan entered into the agreement under duress. Dr. Bryan asserts the discovery rule in response to the assertion of any statute of limitations defense.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Bryan, Pneuma Nitric Oxide, NOi, and Bryan Nitriceuticals pray for judgment against Human N, Joel Kocher, and AnnMarie Kocher as follows:

A.     For preliminary and permanent injunctions prohibiting Human N, its officers, directors, agents, principles, divisions, representatives, servants, employees, associates, subsidiaries, affiliates, attorneys, successors and assigns, and all persons in active concert or participation with any of them, from engaging in false or misleading advertising with respect to its products that are not the Human N Original Beets Products and/or violating the Lanham Act, 15 U.S.C. § 1125(a), which relief includes, but is not limited to, refraining from marketing its new products as scientifically supported by Dr. Bryan's research, findings, and technology, removal of all false or misleading advertisements and corrective advertising to remedy the effects of Human N's false advertising;

B.     For an order requiring Human N, along with its officers, directors, agents, principles, divisions, representatives, servants, employees, associates, subsidiaries, affiliates, attorneys, successors and assigns, and all persons in active concert or participation with any of them, to destroy all advertisements, catalogs, brochures, labels and/or product literature that

falsely avers and misrepresents that its products that are not the Human N Original Beets

Products as scientifically supported by Dr. Bryan's research, findings, and technology;

      C.      That Human N be ordered to pay for corrective advertising;

      D.      That Human N be adjudged to have violated 15 U.S.C. § 1125(a) by unfairly

competing against Pneuma Nitric Oxide, NOi, and/or Bryan Nitriceuticals by using false,

deceptive or misleading statements of fact that misrepresent the nature, characteristic and quality

of Human N's products that are not the Human N Original Beets Products;

      E.      That the Human N be adjudged to have violated 15 U.S.C. § 1125(a) by unfairly

competing against Pneuma Nitric Oxide, NOi, and/or Bryan Nitriceuticals by using false,

deceptive or misleading statements of fact that misrepresent the nature, characteristic and quality

of Human N's products that are not the Human N Original Beets Products;

      F.      For an order declaring the 2017 Consulting Agreement, as amended by the 2019

Amendment, is invalid, void, and ineffective;

      G.      For an order requiring Defendants to provide a record of all company

transactions, earnings, revenues, profits, and/or income from the founding of Human N to the

present day;

      H.      For an order for attorneys' fees, costs of suit, and expenses incurred in this action;

and

      I.      For such other relief to which Plaintiff is found to be justly entitled in law or

equity.

## DEMAND FOR JURY TRIAL

      Plaintiffs demand a jury trial on all matters triable in this action to a jury pursuant to Rule

38(b) of the Federal Rules of Civil Procedure.

Date: October 27, 2023                    Respectfully submitted,


By:    /s/ *Sean M. Reagan*

Sean M. Reagan (*pro hac vice* application
forthcoming)

THE REAGAN LAW FIRM
Sean M. Reagan
Texas Bar No. 24046689
R. Scott Poerschke
Texas Bar No. 24067822
2221 South Voss Road, Suite 200
Houston, Texas 77057
888.550.8575
888.611.8020 (Facsimile)
sean@reaganfirm.com


Matthew M. Gurvitz (*pro hac vice* application
forthcoming)

WILLKIE FARR & GALLAGHER LLP
2029 Century Park East, Suite 2900
Los Angeles, CA 90067
Tel: 310-855-3000
Fax: 310-855-3099
Email: mgurvitz@willkie.com

*Attorneys for Plaintiffs Nathan S. Bryan;*
*Pneuma Nitric Oxide, LLC; Nitric Oxide*
*Innovations, LLC; and Bryan Nitriceuticals*